# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MOLLY KIRBY,** | : | |
| **Plaintiff** | : | **Civil Action No. 4:09-cv-01695** |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | |
| **LOYALSOCK TOWNSHIP SCHOOL** | : | |
| **DISTRICT, ALLEN DiMARCO, in his** | : | |
| **official and individual capacity, and** | : | |
| **RICHARD J. MEXTORF, in his official** | : | |
| **and individual capacity,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Pending before the Court is Defendants' motion for summary judgment.  (Doc. No. 30.)

The motion has been fully briefed and is ripe for disposition.  For the reasons that follow, the

Court will grant Defendants' motion.

## I.    BACKGROUND

Plaintiff attended high school in the Loyalsock Township School District ("the District")

and graduated at the end of the 2008-2009 school year.  (Doc. No. 32 ¶ 9.)  Plaintiff played

basketball for the school until she quit the team during her senior year of high school.  (Id. ¶ 10.)

Beginning around the end of her sophomore year, Plaintiff began to feel intimated by other girls

on the basketball team.  (Id. ¶ 13.)  Five girls in particular were involved.  (Doc. No. 32 ¶ 14.)

According to Plaintiff, the girls "started to avoid me.  They didn't want to talk to me.  They

didn't want me on their team.  Just little signs of not wanting me there.  I wasn't invited to go

places with them, things like that."  (Id. ¶ 15.)  During her junior year, some of Plaintiff's

teammates wore t-shirts to practice that said "Out of Control."  (Id. ¶ 24.)  Defendant DiMarco,

the high school principal, and Mr. Insinger, the school's athletic director, told the teammates not

to wear the t-shirts because Plaintiff believed the phrase "Out of Control" was directed at her. (Id.)

Plaintiff's father, who coached the District's varsity basketball team until November 2008, met with Defendant DiMarco and Mr. Insinger in November 2008 and stated that "there has to be an acknowledgment that what [Plaintiff's teammates are] doing is wrong and it has to stop." (Id. ¶¶ 11, 12, 26.) Plaintiff's father also wrote a letter to Mr. Insinger in November, asking Mr. Insinger to "take any and all steps necessary to make sure [Plaintiff] faces no harassment this coming year." (Id. ¶ 27.) Mr. Insinger responded to Plaintiff's father in a letter detailing what he was going to do to ensure that Plaintiff had "a successful year." (Id. ¶ 28.) Mr. Insinger also talked directly with Plaintiff. (Id.) During Plaintiff's senior year, Defendant Mextorf, the District's superintendent, offered to provide her with a "female companion"[1] to follow her around school and keep her separated from those who were allegedly bullying her. (Id. ¶ 29.) Plaintiff's family rejected this offer. (Id. ¶ 30.) The District also offered to provide mediation services to Plaintiff any time she was willing to sit down with the other students to address her concerns. (Id. ¶ 31.) This offer was made to Plaintiff several times but was also rejected. (Id. ¶ 32.)

In the spring semester of Plaintiff's senior year, a rumor that Plaintiff was pregnant circulated the high school. (Id. ¶ 35.) On February 4, 2009, Plaintiff made a formal complaint with the school against a fellow student, one of Plaintiff's teammates, alleging that the student

---

[1] Defendants' statement of material facts states that the District offered to provide Plaintiff with a female security guard. (Doc. No. 32 ¶ 29.) Defendants cite to Plaintiff's father's testimony that a "security guard" was offered. (Doc. No. 32-3, Ex. C at 40:1.) Plaintiff admits that the District offered to provide a "female companion," but denies that the District offered Plaintiff a "security guard." (Doc. No. 33 ¶ 29.)

started the pregnancy rumor.  (Id. ¶ 34.)  The District offered Plaintiff an opportunity to discuss the matter with the student and a state trooper.  (Id. ¶ 36.)  Plaintiff and her family rejected the offer "because it was Plaintiff's position that a state police officer was not needed to tell her what harassment was and that he should discuss this matter with [the student]."  (Id. ¶ 36; Doc. No. 33 ¶ 36.)  Plaintiff and her father also rejected the District's offer to meet with the student and her parents to discuss Plaintiff's concerns about the pregnancy rumor.  (Doc. No. 32 ¶¶ 38, 39.)  Dr. Reitz, the high school assistant principal, was unable to determine whether the student started the rumor.  (Id. ¶ 40.)  Dr. Reitz never received any admission from the student, and could not corroborate any testimony from other witnesses he had spoken with.  (Id.)

On March 26, 2009, Plaintiff and her father filed a complaint regarding an incident between Plaintiff and others in the cafeteria, including one of Plaintiff's teammates.  (Id. ¶ 42.)  As a part of Dr. Reitz's investigation of the complaint, he reviewed video from the cafeteria on the date in question.  (Id. ¶ 43.)  Dr. Reitz stated that the video revealed nothing remarkable.  (Id.)  He also stated that the teammate's actions and body language were inappropriate but did not rise to the level of harassment.  (Doc. No. 33 ¶ 43.)  Dr. Reitz spoke directly with the teammate regarding the cafeteria incident.  (Doc. No. 32 ¶ 44.)

Plaintiff quit the basketball team her senior year because "I got to a point where I wasn't enjoying it anymore because of the harassment every day, and I didn't feel when I entered the gym I should have to feel uncomfortable."  (Id. ¶ 45, Doc. No. 33 ¶ 45.)  Plaintiff chose not to attend the senior class trip in which the class went white water rafting.  (Doc. No. 32 ¶ 47.)  Although Defendant DiMarco offered to sit with Plaintiff on the bus and in the same raft on the trip, Plaintiff rejected the offer because she felt it would be embarrassing.  (Id. ¶ 48.)  Defendant

DiMarco also wrote a letter to two male students who planned to attend the prom with Plaintiff's former teammates and warned them that if anything happened at the prom, "it would be on them."  (Id. ¶ 51.)  There were no incidents between Plaintiff and the alleged bullies at prom. (Id. ¶ 52.)  Plaintiff also chose not to attend her graduation.  (Id. ¶ 53.)

Plaintiff met with Defendant DiMarco multiple times to discuss the way she was being treated.  (Id. ¶ 22.)  Plaintiff met once with Defendant Mextorf, the District's superintendent, and Plaintiff "told him a bit about how I had been being [sic] harassed. . . ."  (Id. ¶ 19.)  Plaintiff's father met with Defendant Mextorf on more than one occasion during Plaintiff's time in high school, including once during Plaintiff's junior year to discuss five separate incidents in which Plaintiff's teammates were allegedly bullying her.  (Id. ¶ 20; Doc. No. 33 ¶ 20.)  One of the alleged bullies recalled that she met with Defendant DiMarco "pretty often" during her senior year to discuss "different circumstances where [Plaintiff] was accusing us of treating her badly." (Doc. No. 32 ¶ 54.)  Another alleged bully stated that she met with Defendant DiMarco on five or six occasions to talk about reports made by Plaintiff, explaining that "they would call me down because [Plaintiff] would go to them and tell them about an incident, and they would discuss it with me to find out the details."  (Id. ¶ 55.)  Finally, another alleged bully recalled that Defendant DiMarco called her to the office twice to talk about Plaintiff's complaints.  (Id. ¶ 56.)

During the period at issue, the District had a written anti-bullying policy ("the Policy"). (Id. ¶ 1.)  The Policy defined the term "bullying" to include:

- Placing a student in reasonable fear of physical harm;
- Placing a student in emotional unrest by spreading rumors, manipulating social relationships or environment, engaging in social exclusion, extortion, intimidation and ridicule;
- Creating an intimidating or hostile environment that substantially interferes with a student's educational

> opportunities; and
> • Creating verbal statements or written remarks that are
>   taunting, malicious, threatening, or sexual.

(Id. ¶ 2.)  Under the Policy, each building principal or designee is authorized to investigate

reports of bullying.  (Id. ¶ 3.)  According to the Policy, "an investigation of a report may include

meetings with students, parents, guardians or employees, a review of student records, and other

reasonable efforts to understand the facts surrounding a reported incident."  (Id. ¶ 4; Doc. No.

32-11 at 3.)  Consequences for students found to have bullied others "may include counseling, a

parent/guardian conference, detention, suspension, expulsion, a loss of school privileges and/or

exclusion from school-sponsored activities."  (Doc. No. 32 ¶ 5; Doc. No. 32-11 at 4.)

Plaintiff filed the complaint in this action on August 31, 2009, alleging that Defendants

violated her constitutional rights to freedom of association, substantive and procedural due

process, and equal protection.  (Doc. No. 1.)  Plaintiff also alleged a claim of municipal liability

against Defendant Loyalsock Township School District.  (Id.)  On December 23, 2009, the Court

dismissed all claims brought against Defendant DiMarco and Defendant Mextorf in their official

capacity.  (Doc. No. 13.)  Defendants filed a motion for summary judgment, a brief in support,

and a statement of facts on February 22, 2011.  (Doc. Nos. 30, 31, 32.)  Plaintiff filed a brief in

opposition and a statement of facts on March 15, 2011.  (Doc. Nos. 33, 34.)  Defendants filed a

reply brief and a counterstatement of facts on March 28, 2011.  (Doc. Nos. 35, 36.)

## II.    STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is

warranted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[2]  A factual dispute is

material if it might affect the outcome of the suit under the applicable law, and it is genuine only

if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a

verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49

(1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient

disagreement to require submission to the jury or whether it is so one-sided that one party must

prevail as a matter of law.  Id. at 251-52.  In making this determination, the Court must "consider

all evidence in the light most favorable to the party opposing the motion."  A.W. v. Jersey City

Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

      The moving party has the initial burden of identifying evidence that it believes shows an

absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d

135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of

evidence to support the non-moving party's claims, "the non-moving party must rebut the

motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal

memoranda, or oral argument."  Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d

Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-moving party

"fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden at trial," summary judgment is

warranted. Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the

--------

[2] The Court notes that Rule 56 was revised by amendment effective December 1, 2010. "The standard for granting summary judgment remains unchanged," and "[t]he amendments will not affect continuing development of the decisional law construing and applying these phrases." Fed. R. Civ. P. 56 advisory committee's note to 2010 Amendments.

non-moving party must provide, a court should grant summary judgment where the non-movant's evidence is merely colorable, conclusory, or speculative.  Anderson, 477 U.S. at 249-50.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Further, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial.  Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

## III.   DISCUSSION

Defendants argue that Plaintiff has failed to establish as a matter of law that they violated her First Amendment right to freedom of association, Fourteenth Amendment right to equal protection, and her Fourteenth Amendment right to procedural and substantive due process. (Doc. No. 30 ¶¶ 6, 7.)  In the alternative, Defendant DiMarco and Defendant Mextorf assert that they are entitled to qualified immunity.  (Id.)  Defendants also argue that Plaintiff has failed to establish as a matter of law that her constitutional rights were violated as a result of a policy, practice, or custom of Defendant Loyalsock Township School District.  (Id.)  The Court will address each argument in turn.

### A.    Freedom of Association

Plaintiff first alleges that Defendants "deprived [her] of her federally secured rights of freedom of association . . . ."  (Doc. No. 1. ¶ 25.)  Plaintiff filed her claim pursuant to 42 U.S.C. § 1983.[3]  (Id. ¶ 28.)  Section 1983 "is not itself a source of substantive rights, but merely

_____

[3] Section 1983 provides, in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia subjects, or causes to be subjected, any citizen of the United States or other person . . . to the

provides a method for vindicating federal rights elsewhere conferred." <u>Graham v. Connor</u>, 490 U.S. 386, 393-94 (1989).  Plaintiff argues that Defendants violated her First Amendment right to freedom of association when "the lack of any punishment for the bullies" caused her to quit the basketball team, not attend senior night, not attend the senior class trip, and not attend graduation.  (Doc. No. 34 at 6-7.)

Two kinds of protected association have been recognized: intimate association and expressive association.  <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 617-18 (1984).  The first type of associational freedom—intimate association—protects "associations founded on intimate relationships in which freedom of association is protected as a fundamental element of liberty." <u>Rode v. Dellarciprete</u>, 845 F.3d 1195, 1204 (3d Cir. 1988).  Plaintiff argues that Defendants' interfered "with [Plaintiff's] personal relationships" by causing Plaintiff "to avoid events which most of us hold dear and close to our heart."  (Doc. No. 34 at 7.)  Defendants argue that Plaintiff "knowingly and of her own volition" chose not to participate in school functions.  (Doc. No. 31 at 10.)  Defendants also assert that Plaintiff has presented no evidence that Defendants infringed on an intimate relationship that is protected by the Constitution.  (<u>Id.</u>)  The Court must agree with Defendants.  Assuming that Defendants' conduct did cause Plaintiff to quit the basketball team and avoid certain school functions, Plaintiff has failed to prove that the relationships at issue were of the sort afforded special constitutional protection.

"The Constitution does not recognize a generalized right of social association." <u>Sanitation and Recycling Inds. v. City of New York</u>, 107 F.3d 985, 996 (2d Cir. 1997).  "Only

---

deprivation of any rights, privileges or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."  42 U.S.C. § 1983.

relationships 'distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship' are likely to implicate protection." Rode, 845 F.2d at 1204-05 (quoting Roberts, 468 U.S. at 620). The Supreme Court has stated that relationships that might be entitled to constitutional protection include "those that attend the creation and sustenance of a family," such as marriage, childbirth, the raising and education of children, and cohabitation with one's relatives. Roberts, 468 U.S. at 619. While protection is not limited to family relationships, the Supreme Court has explained that "the First Amendment protects those relationships . . . that presuppose 'deep attachments and commitments to the necessary few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of life.'" Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 546 (1987) (quoting Roberts, 468 U.S. at 619-20). To determine whether an association is protected, courts should consider "the size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship." Id.

Considering these factors, the Court finds that Plaintiff's friendships with her classmates and basketball teammates are legally insufficient to be protected by the First Amendment. Many courts, including the Third Circuit, have concluded that friendships fall outside the scope of the First Amendment. See Gruenke v. Seip, 225 F.3d 290 (3d Cir. 2000) ("[Defendant's] alleged interference with [plaintiff's] interaction with other swimmers clearly does not amount to a violation of a protected right"); Viera v. Presley, 988 F.2d 850, 853 (8th Cir. 1993) ("[Plaintiff] does not allege a close, intimate relationship of the type recognized as protected by Roberts. It merely characterizes [Plaintiff's] associates as friends and acquaintances."); Rode, 845 F.2d at

1205 (finding that even Plaintiff's relationship with her brother-in-law who was her "good friend" failed to establish a constitutionally-protected intimate relationship); <u>Dominic J. v. Wyo. Valley West High Sch.</u>, 362 F. Supp. 2d 560, 569 (M.D. Pa. 2005) (granting summary judgment on plaintiff's First Amendment freedom of association claims after finding that "it is clear that the relationships of members of the same swim team, whether it be during school or summer break, are of a purely social nature"); <u>McCusker v. City of Atlantic City</u>, 959 F. Supp. 669, 672 (D. N.J. 1996) (finding that the relationship between fellow police officers who were "professional friends" is not an association protected by the First Amendment); <u>Lutz v. York</u>, 692 F. Supp. 457, 459 (M.D. Pa. 1988) (concluding that plaintiff's challenge to an ordinance that prohibited cruising failed because "[a] random meeting with other cruisers, even those who could be considered friends, is not the type of association protected by the constitution"). Accordingly, the Court will grant Defendants' motion with respect to this claim.

The second type of associational freedom—expressive association—protects "associations formed for the purpose of engaging in activities protected by the First Amendment, such as the exercise of speech, assembly, and religion." <u>Rode</u>, 845 F.2d at 1204 (citing <u>Roberts</u>, 468 U.S. at 617-18). It appears that Plaintiff is not arguing that Defendants interfered with her right of association for expressive purposes. (<u>See</u> Doc. No. 34 at 6-7.) Indeed, Plaintiff has not alleged any expressive purpose to her associations with her classmates. Moreover, the Court finds that there is nothing in the record to suggest the relationships at issue were created for the purpose of engaging in activities protected by the First Amendment. To the extent that Plaintiff alleges a claim of violation of the freedom of association for expressive purposes, this claim also fails.

**B.      Equal Protection**

Next, Plaintiff claims that she was denied equal protection because the principal and the athletic director, not the assistant principal, conducted investigations into complaints made by Plaintiff and her parents.  (Doc. No. 34 at 9.)  Plaintiff also asserts that her equal protection rights were violated because "on at least one prior occasion there was an incident of bullying, and [Defendant DiMarco] conducted a conference with the parents and resolved the issue."  (Id.)

Under the Fourteenth Amendment, no State "shall deny to any person within its jurisdiction equal protection of the laws."  U.S. Const. amend. XIV, § 1.  In Phillips v. Cnty. of Allegheny, 515 F.3d 224 (3d Cir. 2008), the Third Circuit set out the standard for a "class of one" equal protection claim:

> [T]o state a claim for "class of one" equal protection, a plaintiff must at a minimum allege that he was intentionally treated differently from others similarly situated by the defendant and that there was no rational basis for such treatment.

Id. at 243.  After carefully reviewing the evidence, the Court finds that Plaintiff has failed to establish that she was treated differently than similarly situated students.  Plaintiff's examples of alleged disparate treatment are so general that it is impossible for the Court to determine whether other students involved were similarly situated.  Plaintiff asserts that "the mere fact that the principal would not have the person in charge of disciplinary action, Dr. Reitz [the assistant principal], conducting an investigation demonstrates that Defendants responded differently to [Plaintiff's] complaints than those from other students."  (Doc. No. 34 at 9.)  While Dr. Reitz testified that he would normally conduct investigations into student complaints, and that it was rare for Defendant DiMarco as principal to conduct investigations, Dr. Reitz also testified that

11

from 2007 to 2009 he was not directed by Defendant DiMarco to conduct any investigations into complaints of bullying despite the fact that the school received eight to ten complaints of bullying from students other than Plaintiff during that time.  (Doc. No. 32-6, Ex. F, at 13:3-16; 16:1-25.)  Plaintiff has failed to identify any similarly situated student whose complaint was investigated by Dr. Reitz at the direction of Defendant DiMarco.[4]

Indeed, Plaintiff has failed to identify any similarly situated student whose complaints were investigated differently.  In further support of her claim that she received disparate treatment, Plaintiff asserts that Defendant DiMarco conducted a parent conference in response to another student's complaint of bullying.  (Doc. No. 34 at 9.)  However, it is undisputed that Plaintiff rejected the administration's offer to facilitate a meeting between Plaintiff, the student Plaintiff complained of, and both students' parents.  (Doc. No. 32 ¶ 38; Doc. No. 33 ¶ 38.)  Additionally, the parties do not dispute that Plaintiff's father also refused the administration's offer.  (Doc. No. 32 ¶ 39, Doc. No. 33 ¶ 39.)  Plaintiff cannot reject the administration's offer of a parent conference only to later claim that she received disparate treatment because another student's complaint was resolved through such a conference.  Because Plaintiff has failed to

---

[4] The Court notes that even if Plaintiff could identify a similarly situated student whose complaint of bullying was investigated by Dr. Reitz at the direction of Defendant DiMarco, it would find that there was a rational basis for the disparate treatment.  As a preliminary matter, the Policy does not require that the assistant principal investigate complaints of bullying.  Instead, the Policy authorizes the principal or a designee to investigate complaints.  (See Doc. No. 32-11 at 3.)  As principal, Defendant DiMarco was certainly authorized to investigate Plaintiff's complaints.  Further, Mr. Insinger was authorized to investigate Plaintiff's complaints as a designee.  Due to the fact that Plaintiff's complaints related to her basketball teammates, the Court finds that Defendant DiMarco had a rational basis for assigning the investigation of Plaintiff's complaint to Mr. Insinger, the athletic director.  Thus, because the disparate treatment "is neither arbitrary or capricious, but . . . grounded on some reasonable policy, there is no denial of protection of the laws."  Jamieson v. Robinson, 641 F.2d 138, 142 (3d Cir. 1981).

offer any evidence that she was treated differently than others similarly situated, the Court will

grant Defendants' motion as to Plaintiff's equal protection claim.

### C.      Procedural Due Process

Plaintiff next contends that Defendants violated her procedural due process rights under

the Fourteenth Amendment.[5]  To state a procedural due process claim under section 1983, the

plaintiff must allege that (1) she was deprived of an interest encompassed within the Fourteenth

Amendment's protection of life, liberty, and property; and (2) the procedures available to the

plaintiff did not provide due process of law.  Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000).

Thus, the Court must first determine whether Plaintiff suffered a deprivation of a protected

property or liberty interest.

 "Protected interests in property are normally 'not created by the Constitution.  Rather,

they are created and their dimensions are defined' by an independent source such as state statutes

or rules entitling the citizen to certain benefits."  Shertzer v. Penn Manor Sch. Dist., 422 F.3d

141, 149 (3d Cir. 2005) (citing Goss v. Lopez, 419 U.S. 565, 572-73 (1975)).  Under

Pennsylvania law,[6] a student has a "legitimate claim of entitlement to a public education."  Id.

However, Plaintiff has not alleged or presented evidence that Defendants deprived her of a

public education.  Instead, Plaintiff is asserting that Defendants deprived her of a protected

property interest in participating in extracurricular activities.  It is undisputed that Plaintiff "quit

---

[5] The Fourteenth Amendment provides, in pertinent part, that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.

[6] The Pennsylvania Administrative Code provides that "[e]ducation is a statutory right, and students must be afforded all appropriate elements of due process if they are to be excluded from school."  22 PA. CODE § 12.8(a) (2005).

the basketball team during her senior year," "chose not to attend her senior class night," "chose

not to attend her senior class trip," and "chose not to attend her graduation." (Doc. No. 32 ¶¶ 45,

46, 47, 53; Doc. No. 33 ¶¶ 45, 46, 47, 53.) It is also undisputed that "Plaintiff believes she was

entitled to play basketball for the school." (Doc. No. 32 ¶ 59; Doc. No. 33 ¶ 59.) Defendants

argue that Plaintiff has failed to establish that they deprived her of any protected liberty or

property interest. (Doc. No. 31 at 14.) The Court must agree with Defendants. The Supreme

Court has not addressed the issue of whether a public school student has a protected property

interest in participating in extracurricular school activities. However, many courts have held that

a public school student does not have a protected property interest in extracurricular activities.

See Lowery v. Euverard, 497 F.3d 584, 588 (6th Cir. 2007) ("It is well-established that students

do not have a general constitutional right to participate in extracurricular athletics."); Angstadt v.

Midd-West Sch. Dist., 377 F.3d 338, 344 (3d Cir. 2004) (affirming district court ruling that

public school student did not have a protected property interest in extracurricular activities);

Davenport v. Randolph Cnty. Bd. of Educ., 730 F.2d 1395 (11th Cir. 1984); Herbert v.Ventetulo,

638 F.2d 5 (1st Cir. 1981); Walsh v. La. High Sch. Athletic Ass'n, 616 F.2d 152 (5th Cir. 1980);

Dominic J., 362 F. Supp. 2d at 571-72 (finding that public school student did not have a

protected property interest in participating in extracurricular activities); Dallam v. Cumberland

Valley Sch. Dist., 391 F. Supp. 358 (M.D. Pa. 1975). In Dallam, the court aptly stated:

> [T]he property interest in education created by the state is
> participation in the entire process. The myriad activities which
> combine to form that education process cannot be dissected to create
> hundreds of separate property rights, each cognizable under the
> Constitution. Otherwise, removal from a particular class, dismissal
> from an athletic team, a club or any extracurricular activity, would
> each require ultimate satisfaction of procedural due process.

14

Dallam, 391 F. Supp. at 361.  Accordingly, the Court finds that Plaintiff does not have a

protected property interest in participating in extracurricular activities.  The Court will grant

Defendants' motion with respect to this claim.

> **D.    Substantive Due Process**

Plaintiff also alleges that Defendants violated her substantive due process rights.  (Doc.

No. 1 ¶¶ 25, 30.)  Substantive due process contains two separate analytical paths depending on

whether the government action at issue is legislative or non-legislative.  See Nicholas v.

Pennsylvania State Univ., 227 F.3d 133, 139 (3d Cir. 2000).  This case involves non-legislative

or executive acts, which typically apply to one or a limited number of persons.  Id. at 139 n.1.

For such acts, the Fourteenth Amendment primarily protects individuals from the arbitrary

exercise of power by government officials through procedural due process, as discussed above.

Id. at 139.  The Third Circuit has recognized, however, that "a non-legislative government

deprivation 'that comports with procedural due process may still give rise to a substantive due

process claim upon allegations that the government deliberately and arbitrarily abused its

power.'"  Id. (quoting Independent Enters. Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d

1165, 1179 (3d Cir. 1997)).  In order to proceed on this claim, "'a plaintiff must establish as a

threshold matter that he has a protected property interest to which the Fourteenth Amendment's

due process protection applies.'"  Hill v. Borough of Kutztown, 455 F.3d 225, 235 n.12 (3d Cir.

2006) (quoting Nicholas, 227 F.3d at 139-140)).  Unlike procedural due process, reference to

state law does not control whether a property interest is protected for purposes of substantive due

process.  Id.  This distinction exists because "not all property interests worthy of procedural due

process protection are protected by the concept of substantive due process," which requires that

"'a plaintiff must have been deprived of a <u>particular quality</u> of property interest.'"  <u>Nicholas</u>, 227

F.3d at 140 (quoting <u>DeBlasio v. Zoning Bd. of Adjustment</u>, 53 F.3d 592, 598 (3d Cir. 1995)).

Therefore, to qualify for substantive due process protection, the property interest being deprived

must be constitutionally fundamental.  <u>Id.</u> at 142.  If the property interest falls into this limited

category, substantive due process protects an individual from government deprivation of that

interest by means of arbitrary or egregious conduct which "shocks the conscience," regardless of

the procedures used.  <u>See</u> <u>id.</u>

Defendants argue that Plaintiff "has failed to establish the existence of a fundamental

right or interest of which she supposedly was deprived by Defendants."  (Doc. No. 31 at 16.)

The Court agrees that Plaintiff's brief in opposition focuses on the appropriate "shocks the

conscience" standard of review.  (<u>See</u> Doc. No. 34 at 12-13.)  Whether the government conduct

at issue meets this standard is a secondary question, however, because "[i]f the interest is not

'fundamental,' . . . the governmental action is entirely outside the ambit of substantive process

and will be upheld so long as the state satisfies the requirements of procedural due process."

<u>Nicholas</u>, 227 F.3d at 142.  As noted above, Plaintiff has not alleged or presented evidence that

she was deprived a public education.  Further, Plaintiff concedes that "there is no dispute that

education itself does not constitute a fundamental right of protection of the federal constitution."

(Doc. No. 34 at 10.)  Instead, Plaintiff appears to rely on the fact that under Pennsylvania law a

student has a legitimate claim of entitlement to a public education.  (<u>Id.</u>)  Plaintiff does not

address the fact that reference to state law does not control whether a property interest is

protected for purposes of substantive due process.  <u>See</u> <u>Nicholas</u>, 227 F.3d at 140.  Instead, the

interest must be considered "fundamental" under the United States Constitution.  <u>Id.</u>  The

Supreme Court has held that there is no fundamental right to a public education.  See San Antonio Indep. Sch. Dist. v. Rodriquez, 411 U.S. 1, 35-37 (1973) ("We have carefully considered each of the arguments supportive of the District Court's finding that education is a fundamental right or liberty and have found those arguments unpersuasive.").  Thus, since there is no fundamental right to a public education, there is no fundamental right to participate in extracurricular school activities.  See Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 553 (3d Cir. 2007) ("Clearly . . . there is no fundamental right to participate in intercollegiate athletics, a component of public education.").  Because Plaintiff has failed to establish the deprivation of a fundamental right, the Court will grant Defendants' motion as to Plaintiff's substantive due process claim.  See Nicholas, 227 F.3d at 141 ("[A] property interest must be constitutionally 'fundamental' to implicate substantive due process.").

### E.      Qualified Immunity

In addition to arguing that Plaintiff has failed to establish as a matter of law that her constitutional rights were violated, Defendant DiMarco and Defendant Mextorf assert that they are entitled to qualified immunity.  (Doc. No. 30 ¶ 6.)  For the reasons stated above, the Court finds that Defendants are entitled to judgment as a matter of law.  Accordingly, the Court need not address the argument that Defendant DiMarco and Defendant Mextorf are entitled to qualified immunity.

### F.      School District Liability

Finally, Plaintiff claims that Defendant Loyalsock Township School District ("the District") is subject to municipal liability because Defendant DiMarco and Defendant Mextorf executed the District's anti-bullying policy in a way that violated Plaintiff's constitutional rights.

17

(Doc. No. 34 at 13.)  Municipal liability under section 1983 is available only under certain circumstances.  <u>Monell v. Department of Social Services</u> provides that "local governing bodies . . . can be sued directly under section 1983 . . . where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  436 U.S. 658, 690 (1978).  Because the Court has found that the actions of Defendant DiMarco and Defendant Mextorf did not violate Plaintiff's constitutional rights, there can be no liability imposed on the District for their actions.  <u>See</u> <u>Brown v. Commonwealth of Pa., Dep't of Emergency Med. Servs.</u>, 318 F.3d 473, 482 (3d Cir. 2003) ("[F]or there to be municipal liability, there still must be a violation of the plaintiff's constitutional rights."); <u>Gardner v. Luzerne Cnty.</u>, 645 F. Supp. 23 325, 343 (M.D. Pa. 2009) ("Because there is no constitutional violation in this action, the <u>Monell</u> claims will be dismissed.").

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Doc. No. 30) will be granted.  An order consistent with this memorandum follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
|  | : |  |
| **MOLLY KIRBY,** | : |  |
| **Plaintiff** | : | **Civil Action No. 4:09-cv-01695** |

|  | : | (Chief Judge Kane) |

**v.**                                              :

                                                    :

**LOYALSOCK TOWNSHIP SCHOOL**        :

**DISTRICT, ALLEN DiMARCO, in his**    :

**official and individual capacity, and**   :

**RICHARD J. MEXTORF, in his official**  :

**and individual capacity,**                  :

          **Defendants**                     :

## ORDER

     **NOW**, on this 6th day of September 2011, upon consideration of Defendants' motion for summary judgment (Doc. No. 30), and for the reasons set forth in the accompanying memorandum, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment is **GRANTED** as to all claims.  The Clerk of Court is directed to close the case.

                          S/ Yvette Kane

                          Yvette Kane, Chief Judge

                          United States District Court

                          Middle District of Pennsylvania